**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 22-4671**

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

v.

QUENTIN LOWELL HORSLEY,

Defendant - Appellant.

Appeal from the United States District Court for the Western District of Virginia, at Lynchburg.  Norman K. Moon, Senior District Judge.  (6:19-cr-00012-NKM-JCH-1)

Argued: May 10, 2024                                    Decided:  June 24, 2024

Before THACKER, BENJAMIN, and BERNER, Circuit Judges.

Affirmed by published opinion.  Judge Thacker wrote the opinion, in which Judge Benjamin and Judge Berner joined.

**ARGUED:**  Jeffrey Michael Brandt, ROBINSON & BRANDT, P.S.C., Covington, Kentucky, for Appellant.  S. Cagle Juhan, OFFICE OF THE UNITED STATES ATTORNEY, Charlottesville, Virginia, for Appellee.  **ON BRIEF:**  Christopher R. Kavanaugh, United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Roanoke, Virginia, for Appellee.

THACKER, Circuit Judge:

Following a jury trial, Quentin Lowell Horsely ("Appellant") was convicted of conspiring to distribute, and possession with intent to distribute, cocaine, methamphetamine, heroin, and cocaine base, as well as three counts of distributing cocaine. At trial, the evidence against Appellant included witness testimony from his co-conspirators, Kenneth Adgerson and Travis Smiley; text messages extracted from cellphones; evidence of controlled buys conducted by Government informants; and drugs, drug paraphernalia, and large sums of cash seized during the searches of three houses and a vehicle.

Appellant challenges the admission of several items of evidence. This includes a cellphone that was seized without a warrant at the time of Appellant's arrest. Appellant argues this warrantless seizure violated the Fourth Amendment. It also includes the search of a Jaguar car tied to Appellant. Appellant argues the search of the Jaguar and seizure of its contents was improper because the car was searched without a warrant or probable cause. Appellant moved to suppress the cellphone and the fruits of the Jaguar search, but the district court denied the motion.

Appellant also challenges the testimony of Officer Daniel Bailey, who testified at Appellant's trial as to the meaning of text messages that were extracted from the seized cellphone. Appellant contends that Officer Bailey's interpretation of the texts was improper lay witness testimony, which the district court should have excluded.

Separately, Appellant contends that the district court erred in its handling of the verdict form. When the jury first completed the verdict form, the district judge perceived

2

a clerical error and instructed the jury to return to the jury room to correct the error. When the jury returned, it had not only corrected the identified error, but also marked a previously unmarked portion of the verdict form, thus attributing to Appellant a new drug, cocaine base, as part of the distribution conspiracy. Appellant argues that judgment should not have been entered as to cocaine base because the jury did not mark it on their first execution of the verdict form.

We hold that (1) the district court erred in its failure to suppress the evidence from the cellphone seized at the time of Appellant's arrest, but that, given the weight of the evidence against Appellant, the error was harmless; (2) that the search of the Jaguar and its contents was proper; (3) that Officer Bailey's testimony was improper testimony by a lay witness, but that the district court did not plainly err in allowing it; and that (4) there was no error in connection with the district court's handling of the verdict form.

Thus, while we address the issues on the merits, and agree with some of Appellant's arguments, the unchallenged evidence of guilt was nevertheless sufficient for the jury to have rendered a verdict of guilty on all counts.

Therefore, we affirm.

I.

A.

Background

Between 2016 and 2019, Appellant distributed narcotics in the Lynchburg, Virginia area. He worked as both a dealer and a mid-level distributor, selling narcotics directly and buying large quantities to distribute to smaller quantity dealers. Two of Appellant's

3

associates who are relevant to this appeal, Kenneth Adgerson and Travis Smiley, were smaller quantity dealers.

The Government presented evidence at trial to prove that Appellant was involved in distributing cocaine, heroin, methamphetamine, and cocaine base. That evidence included the testimony of Adgerson and Smiley; testimony regarding controlled buys conducted by Government informants; and text messages extracted from cellphones seized during the investigation into Appellant's activities.

The evidence further indicated that Appellant utilized three properties in the Lynchburg area to store drugs, including his own home and two stash houses. On February 11, 2019, law enforcement executed search warrants at each of these three properties. They seized large quantities of drugs, cash, and paraphernalia such as vacuum seal bags and scales. The drugs seized, which included cocaine, heroin, and methamphetamine, amounted to over $1,000,000 in street value if cut and nearly $650,000 in street value if sold undiluted.[1] The same day, Appellant was arrested at a hotel in Maryland.

Appellant was indicted in the Western District of Virginia on May 8, 2019. A ten count superseding indictment was filed on September 11, 2019. The only counts that were ultimately submitted to the jury, and which are at issue here, were:

> 1. <u>Count 1</u> – a multi-object drug conspiracy for agreeing to distribute and to possess with intent to distribute: more than 500 grams of a mixture containing methamphetamine; more than 500 grams of a mixture containing cocaine hydrochloride;

---

[1] "Cutting" drugs means mixing or diluting them with another substance to multiply the gross weight available for distribution.

4

more than 100 grams of a mixture containing heroin; and cocaine base;

2. <u>Count 5</u> – distributing a detectable amount of cocaine on December 7, 2017;

3. <u>Count 6</u> – distributing a detectable amount of cocaine on December 29, 2017;

4. <u>Count 8</u> – distributing a detectable amount of cocaine on November 1, 2018.

J.A. 31–32.[2]

Prior to trial, Appellant moved to suppress two groups of evidence now at issue in this appeal. First, Appellant moved to suppress evidence gathered from two cellphones -- only one of which was ultimately introduced at trial -- which were seized from the hotel room where Appellant was arrested. Appellant argued that law enforcement did not have a warrant to seize these cellphones and that the seizure did not fall under the warrant exception for a search incident to arrest. Second, Appellant moved to suppress evidence, including cash, cellphones, and expensive jewelry, collected during the post-arrest search of a Jaguar parked in the hotel parking garage. Appellant argued that there was not probable cause to search the Jaguar.

For reasons detailed below, the district court judge denied Appellant's motions to suppress.

---

[2] Citations to the "J.A." refer to the Joint Appendix filed by the parties in this appeal.

B.

Uncontested Evidence Introduced at Trial

At trial, Appellant's defense was that, while there was evidence of his having distributed cocaine, he was not guilty of possession with intent to distribute or conspiring to distribute the other drugs, namely, methamphetamine, heroin, and cocaine base. But the Government introduced considerable evidence to the contrary. That evidence included witness testimony of Appellant's drug distribution associates, recordings of undercover drug transactions, and incriminating text messages. The Government also introduced physical evidence -- including kilograms of methamphetamine, cocaine, and heroin, tens of thousands of dollars of cash, and a ledger memorializing drug transactions.

1.

Controlled Buys

Law enforcement monitored seven controlled buys of cocaine from Appellant between August 2017 and January 2019. An informant named Brandon Hubbard was used for five of the controlled buys, and he testified to obtaining cocaine from Appellant. For the November 1, 2018 and January 2019 controlled buys, the Government used an informant named Jaimz Bowman, sometimes referred to as "Biggs," who also testified at trial regarding his transactions with Appellant. An investigator with the Lynchburg Police Department, Christopher Booth, also testified at trial regarding these controlled buys.

6

2.

Expert Testimony

Detective Matthew Knabb was qualified as an expert in drug trafficking. He testified as to the quantities and prices of cocaine, heroin, and methamphetamine typically sold at the user and distributor levels. He explained the mechanics of drug trafficking and sale, the process of cutting drugs with other substances in order to multiply their gross weights for distribution, and the use of stash houses to avoid detection by other dealers and law enforcement. Detective Knabb also testified that drug dealing is a cash business and that drug dealers typically communicate via cellphones, often in coded language. He further testified that drugs are sometimes sold on consignment, which means the dealer provides drugs to the buyer with the understanding that they will be paid at a later date. And Detective Knabb testified as to the definitions of common slang in the drug trade. That slang included "zip" (ounce), "half" (half ounce), "quarter" (quarter ounce), "brick" (kilogram), "powder, soft, blow" (cocaine), "food or dog food" (heroin), "cream or ice cream or fast" (methamphetamine), "work" (drugs), "ticket" (price of drugs), "band" (stack of a thousand dollars), "fire" (high purity drugs), and "plug" (source of supply). J.A. 660–62.

7

3.

Co-conspirator Testimony

a.

Kenneth Adgerson

Adgerson testified regarding the history of his and Appellant's partnership in the drug trade. Their partnership began in 2016, when Appellant told Adgerson that Appellant could supply him drugs. During their initial meeting, Adgerson bought an ounce of cocaine from Appellant, and Appellant also sold Adgerson two ounces of cocaine on consignment. Adgerson testified that he knew the substance Appellant sold was cocaine because he was an experienced user, tried the drugs, and deemed them high quality. Adgerson also testified that he sold the cocaine to other buyers after cutting it with Miralax.[3]

According to Adgerson, the quantities of cocaine Appellant sold him grew progressively larger until, after December 2016, the two started dealing in kilograms of cocaine. In 2017, Appellant began fearing law enforcement detection and asked Adgerson to store drugs, including a bag of cocaine, at Adgerson's house on Euclid Avenue in Lynchburg.

Adgerson testified that in late 2018, he and Appellant began obtaining drugs other than cocaine, including heroin and methamphetamine. Adgerson testified that he accompanied Appellant on several kilogram-sized purchases of drugs, including, by the

---

[3] Miralax is an over the counter laxative, which Adgerson testified he blended with cocaine in a roughly one-to-one ratio, thus doubling the total quantity for sale.

8

end of 2018, transactions for "coke, heroin, meth, and . . . some weed." J.A. 509–515. Adgerson reported one hotel rendezvous in which the two picked up a large volume and assortment of drugs and stashed them in a duffel bag in a closet at a house on Blackburn Street in Lynchburg. Adgerson also testified that he witnessed Appellant distribute methamphetamine in 2018.

### b.

### Travis Smiley

Another of Appellant's associates, Smiley, also testified for the Government. He said that Appellant approached him in 2017 about selling drugs. He testified that Appellant initially distributed half-ounce quantities of cocaine to him, which Smiley would then cut for re-distribution. Appellant later provided Smiley with larger quantities of cocaine. He gave Smiley up to two ounces at a time, every two weeks, over the course of a year. Smiley testified that Appellant also once offered to sell him heroin and methamphetamine, and that Appellant showed Smiley those drugs.

### 4.

### House Searches

On February 11, 2019, officers executed several search warrants at three residences in connection with their investigation into Appellant's activities. Evidence procured from these searches was introduced at trial.

a.

Blackburn Street House

One search was conducted at 1639 Blackburn Street in Lynchburg. This was the home of Roberta Haskins, a woman who sometimes worked as Adgerson's driver. The Government determined during their investigation that Appellant and Adgerson were using the Blackburn Street house as a stash house. As indicated above, Adgerson testified at trial that he stored drugs at the Blackburn Street house at Appellant's direction.

When officers searched the house, they found several incriminating items inside a duffel bag in a closet: (1) packaging material with drugs inside; (2) two scales; (3) eleven Ziplock baggies; and (4) a small black bag containing two vacuum sealed packages of drugs. The drugs included more than three kilograms of methamphetamine, nearly two kilograms of cocaine, and almost a kilogram of heroin. Adgerson testified that he stored these drugs at the Blackburn house following a transaction that he conducted at Appellant's direction.

b.

Misty Mountain Road Apartment

The same day the search was executed at the Blackburn house, officers also executed a search at Appellant's home, 1009 Misty Mountain Road, Apartment 1212, in Lynchburg. Several pieces of evidence proved this was Appellant's residence. Appellant stated he was paying part of the rent. Officers found a furniture receipt in the residence bearing Appellant's name and the apartment's Misty Mountain Road address. Officers further discovered that a phone number listed on the receipt was the same number that

10

Appellant used to arrange drug deals during the controlled buys. Officers also found a Las Vegas picture frame and picture showing Appellant riding on a four-wheeler, several cellphones, one of which was owned by Appellant, a figurine of Appellant, and an electronic money counter.

In the Misty Mountain Road apartment, officers seized a ledger with the title "Gotta Get Every Dollar." J.A. 679; *see also id.* at 322–324; S.A. 77.[4] This ledger referenced "Kenny" Adgerson and included coded language for methamphetamine, cocaine, and heroin. *Id.* at 680–82.

Officers extracted text messages spanning September 2017 to April 2018 from one of the seized cellphones. One of the text threads was identified by Adgerson at trial as being between himself and Appellant. This thread included these exchanges:

1. In September 2017, Adgerson reported having $8,000 to give Appellant. Appellant requested the money and had a brief exchange with Adgerson about keeping up the pace of transactions.

2. In October 2017, Adgerson texted Appellant, "10,200 almost done," to which Appellant responded "hit me when u get up so we can keep it moving i gotta another one for u." S.A. 217. During the same month, the two discussed "stay[ing] low" because it was "to [sic] hot to be seen." *Id.* at 215.

3. In November 2017, the men discussed the "cat man cartel," how Appellant "caused a drought," and "with out the cat man cartel the whole city will starve." S.A. 214. Adgerson testified that "catman cartel" was in "inside joke" between him, Appellant, and Smiley, referring to the type of car Appellant drove. J.A. 533. Appellant later texted that a supplier "showed

---

[4] Citations to the S.A. refer to the Supplemental Appendix filed by the Government in this appeal.

11

me like 7 bricks bra" and that Appellant "might need [Adgerson] to go with me tonight to pick these keys up." S.A. 209, *id.* at 211. Appellant wrote, "he trust me to owe him 95,000." *Id.* at 208. Appellant and Adgerson discussed how it "will look suspicious as hell driving at 3am" to pick up the supply. *Id.* at 207.

4. In December 2017, Adgerson informed Appellant he had "10,500" for Appellant. S.A. 204.

5. The men continued to text about similar, thousand-dollar denominations into 2018.

Other text messages from the cellphone seized at the Misty Mountain Road address also appeared to refer to drug trafficking. *See* S.A. 102–107 ("thomas" saying "got the money" and asking for "half a gram," discussing "green" and asking for a "half"); *id.* at 108–114 (discussing thousand-dollar payments for Appellant); *id.* at 117, *id.* at 119, *id.* at 122 (discussing getting "half" and "zip"); *id.* at ("1 brick is wht I need").

c.

Euclid Avenue Apartment

A third search was conducted on February 11, 2019, at 614 Euclid Avenue, Apartment A in Lynchburg. Adgerson lived at this apartment and was there when officers executed the search. Officers seized phones, "large amounts of money" in cash, and "ounces of cocaine." J.A. 328–29. Officers also obtained a search warrant to search a Monte Carlo at the Euclid Avenue apartment. They discovered additional cocaine and a gun in the car. Adgerson testified that Appellant had given him the cocaine that was seized from the Monte Carlo.

12

5.

Stipulations

The parties stipulated to the weights of the drugs seized at the three residences and during the controlled buys. These included approximately 3,197 grams of methamphetamine, 2,570 grams of cocaine, and 997 grams of heroin:

| Trial exh. # of physical item | Location Seized | Trial exh. # of lab certification (SA cite) | Drugs Seized (Approx. wt.) |
|---|---|---|---|
| 104 | Blackburn St. (JA433–436) | 105 (SA650) | Heroin (534g) |
| 106 | same | 107 (SA651) | Meth (296g) |
| 108 | same | 109, 110 (photo) (SA652–653) | Cocaine (998g) |
| 111 | same | 112 (SA654) | Cocaine (974g) |
| 113 | same | 114 (SA655) | Heroin (463g) |
| 115 | same | 116 (SA656) | Meth (2,901g) |
| 117 | Monte Carlo at Euclid Ave. (JA436–438, JA521) | 118 (JA437–38) (SA657) | Cocaine (457g) |
| 119 | Controlled buy | 120 (SA658) | Cocaine (10g) |
| 121 | Controlled buy | 122 (SA661) | Cocaine (11g) |
| 123 | Controlled buy | 124 (SA664) | Cocaine (10g) |
| 125 | Controlled buy | 126 (SA667) | Cocaine (29g) |
| 127 | Controlled buy | 128 (SA670) | Cocaine (27g) |
| 129 | Controlled buy | 130 (SA673) | Cocaine (27g) |
| 133 | Controlled buy | 134 (SA676) | Cocaine (27g) |

Response Br. at 16. This amounted to over $1,000,000 in street value if cut and nearly $650,000 in street value if sold undiluted.

C.

Contested Evidence Introduced at Trial

There was other evidence introduced at trial which Appellant argues on appeal should not have been used against him. This includes (1) text messages extracted from a cellphone that was seized from Appellant's hotel room when he was arrested and (2) the contents of the Jaguar car that was searched immediately after Appellant's arrest. Of the two phones seized in the hotel room, only one was introduced at trial. The Government contends that the cellphone introduced at trial contained texts that were largely duplicative of the "general thrust" of the texts on Appellant's phone seized from Misty Mountain Road. Response Br. at 29. The Government seized from the Jaguar two cellphones from the driver's side, and, from the trunk, a bag that contained cash and expensive jewelry. Appellant refused to sign an acknowledgment that the cash belonged to him, although he told police it was inheritance money.

As detailed further below, Appellant argues that the cellphones were not properly seized incident to his arrest because he had been physically secured by officers at the time, and the cellphones were not within his immediate control. He argues the Jaguar was not properly searched because police lacked probable cause to believe that the Jaguar was a proceed of Appellant's alleged drug trafficking. Rather, according to Appellant, the available evidence suggested that the Jaguar belonged to Appellant's sister.

Although Appellant moved to suppress the cellphone and Jaguar evidence prior to trial, he did not object when it was ultimately introduced at trial. The district court ruled that both the cellphone and items seized from the Jaguar were admissible.

14

D.

Jury Verdict

Following a four-day trial, the jury deliberated for two hours before convicting Appellant on all counts. On the verdict form, the multi-object drug conspiracy and possession with intent to distribute charge required the jury to specify the drug weights of each drug allegedly involved in the conspiracy: methamphetamine, cocaine, heroin, and cocaine base. The jury initially found Appellant guilty of the conspiracy and possession with intent to distribute charge at the highest drug weights for methamphetamine and cocaine. The jury also checked a box on the verdict form indicating that Appellant was guilty of conspiracy to distribute heroin, but the jury initially failed to check a box which would attribute any weight to that drug. The jury also did not initially check the box next to cocaine base, either to indicate that it formed a basis of the conspiracy or to indicate any weight:

QUESTION 2: Identify the controlled substances and corresponding amount attributed to QUENTIN LOWELL HORSLEY that formed the basis of the conspiracy in COUNT ONE. Check all controlled substances that apply. For amounts, check only one amount for each controlled substance.

   ✓  Methamphetamine.

       ✓  500 grams or more of a mixture or substance containing a detectable amount of methamphetamine, its salts, isomers, or salts of its isomers;

         50 grams or more (but less than 500 grams) of a mixture or substance containing a detectable amount of methamphetamine, its salts, isomers, or salts of its isomers;

         Less than 50 grams of a mixture or substance containing a detectable amount of methamphetamine, its salts, isomers, or salts of its isomers.

   ✓  Cocaine hydrochloride.

       ✓  500 grams or more of a mixture or substance containing a detectable amount of cocaine hydrochloride;

         Less than 500 grams or more of a mixture or substance containing a detectable amount of cocaine hydrochloride.

   ✓  Heroin.

         100 grams or more of a mixture or substance containing a detectable amount of heroin;

         Less than 100 grams or more of a mixture or substance containing a detectable amount of heroin.

     Cocaine base.

*(Now go to Questions 3, 4, and 5)*

J.A. 818.[5]

Due to the failure to specify a drug weight for heroin, the district court asked the jury, "I mean, is that an oversight?," and a juror speaking on behalf of the jury responded,

---

[5] This image is a modified version of the final verdict form, which has been altered to appear as the form did when the jury first handed it to the district court judge.

16

"Oversight." J.A. 805. Thus, the court ordered the jury to return to the jury room to properly fill out the verdict form. When the jury returned, they had checked the highest drug weight for heroin, and they had also checked "Cocaine base," a drug that was unchecked the first time the jury handed up the verdict form:



QUESTION 2: Identify the controlled substances and corresponding amount attributed to QUENTIN LOWELL HORSLEY that formed the basis of the conspiracy in COUNT ONE. Check all controlled substances that apply. For amounts, check only one amount for each controlled substance.

✓ Methamphetamine.
  ✓ 500 grams or more of a mixture or substance containing a detectable amount of methamphetamine, its salts, isomers, or salts of its isomers;

  _____ 50 grams or more (but less than 500 grams) of a mixture or substance containing a detectable amount of methamphetamine, its salts, isomers, or salts of its isomers;

  _____ Less than 50 grams of a mixture or substance containing a detectable amount of methamphetamine, its salts, isomers, or salts of its isomers.

✓ Cocaine hydrochloride.
  ✓ 500 grams or more of a mixture or substance containing a detectable amount of cocaine hydrochloride;

  _____ Less than 500 grams or more of a mixture or substance containing a detectable amount of cocaine hydrochloride.

✓ Heroin.
  ✓ 100 grams or more of a mixture or substance containing a detectable amount of heroin;

  _____ Less than 100 grams or more of a mixture or substance containing a detectable amount of heroin.

✓ Cocaine base.

(Now go to Questions 3, 4, and 5)

J.A. 818.

17

Appellant objected. He argued that the jury's decision not to check "Cocaine base" when it first returned from deliberations amounted to a finding that Appellant had not conspired to distribute cocaine base. When the jury was recalled to the courtroom, the court first confirmed that the failure to check any amount of heroin "was a clerical . . . oversight." J.A. 813. The jurors all agreed it was. The court then addressed the cocaine base:

> THE COURT: And then when you came back, cocaine base had not been checked, and it is checked now; is that correct?
> ALL JURORS: Yes.
> THE COURT: All right. Was there a finding -- unanimous finding by the jury that cocaine base should have been checked?
> ALL JURORS: Yes.
> THE COURT: All of you agree?
> ALL JURORS: Yes.

*Id.* at 813–14. After this exchange, the court discharged the jury.

Partly based on the issue with the verdict form, Appellant moved for a new trial. The district court denied the motion, holding that the jury's second execution of the verdict form reflected its final decision, and that the first execution included clerical oversights, which the jury corrected.

Appellant timely appealed.

## II.

Appellant raises four issues on appeal: (1) whether officers properly seized cellphones in Appellant's hotel room incident to his arrest; (2) whether officers had probable cause to search a Jaguar located in the garage of the hotel where Appellant was arrested; (3) whether the district court plainly erred when Officer Bailey testified, without

18

being qualified as an expert, regarding the meaning of text messages between Appellant and his associates; and (4) whether it was appropriate for the jury to change the verdict form when they were asked to return to the jury room to correct a separate clerical error.

As to the Fourth Amendment issues, because we are reviewing the district court's ruling on Appellant's motion to suppress, we review factual findings for clear error and legal determinations de novo. *United States v. Abdallah*, 911 F.3d 201, 209 (4th Cir. 2018). And because the motion to suppress was denied, we review the facts in the light most favorable to the Government. *Id.* We review the district court's handling of the jury deliberations, and its choices concerning the verdict form, for abuse of discretion. *Benjamin v. Sparks*, 986 F.3d 332, 353 (4th Cir. 2021). The standard of review regarding Officer Bailey's testimony is disputed and, thus, is discussed in further detail below.

A.

Cellphone Seized from Appellant's Hotel Room

The first issue concerns a cellphone that was seized when officers arrested Appellant in his hotel room.[6] Appellant moved to suppress the seizure of this cellphone, and the district court denied his motion on the basis that the phone was seized incident to arrest.

---

[6] Officers seized two cellphones from Appellant's hotel room at the time of his arrest. But only one of the cellphones seized from the hotel room was admitted into evidence. The Government concedes that the cellphone admitted into evidence was the one located furthest from Appellant in the hotel room.

19

1.

The Fourth Amendment protects "against unreasonable searches and seizures." U.S. Const. amend. IV.  "A warrantless search by the police is invalid unless it falls within one of the narrow and well-delineated exceptions" to the Fourth Amendment's warrant requirement.  *Flippo v. West Virginia*, 528 U.S. 11, 13 (1999) (per curiam) (citing *Katz v. United States*, 389 U.S. 347, 357 (1967)).

One such exception is a search incident to arrest.  *See United States v. Robinson*, 414 U.S. 218, 224 (1973).  "This exception provides that when law enforcement officers have probable cause to make a lawful custodial arrest, they may—incident to that arrest and without a warrant—search 'the arrestee's person and the area within his immediate control.'"  *United States v. Currence*, 446 F.3d 554, 556 (4th Cir. 2006) (quoting *Chimel v. California*, 395 U.S. 752, 763 (1969)).  "Such searches have long been considered valid because of the need 'to remove any weapons that the arrestee might seek to use in order to resist arrest or effect his escape' and the need to prevent the concealment or destruction of evidence."  *New York v. Belton*, 453 U.S. 454, 457 (1981) (alteration omitted) (quoting *Chimel*, 395 U.S. at 763).[7]

---

[7] We assume, without holding, that when the conditions for a proper search incident to arrest arise, officers may secure cellphones with probable evidentiary value to prevent their destruction.  *See Riley v. California*, 573 U.S. 373, 388 (2014) (calling it a "sensible concession" "that officers could have seized and secured . . . cell phones to prevent destruction of evidence while seeking a warrant"); *Stamps v. Capalupo*, 780 F. App'x 45, 46 (4th Cir. 2019) (same).

Noting the two justifications for search incident to arrest -- securing dangerous weapons and preventing the concealment or destruction of evidence -- the Supreme Court has held, "If there is no possibility that an arrestee could reach into the area that law enforcement officers seek to search, both justifications for the search-incident-to-arrest exception are absent and the rule does not apply." *Arizona v. Gant*, 556 U.S. 332, 339 (2009). We have extended this reasoning from its original context, the search of an automobile, to searches of items not contained in an automobile, but nevertheless out of an arrestee's reach. *United States v. Davis*, 997 F.3d 191, 197 (4th Cir. 2021) ("[W]e see no reason to limit the first *Gant* holding—the one derived from *Chimel*—to searches of vehicles.").

Thus, "police officers can conduct warrantless searches of non-vehicular containers incident to a lawful arrest 'only when the arrestee is unsecured and within reaching distance of the [container] at the time of the search.'" *Davis*, 997 F.3d at 197 (quoting *Gant*, 556 U.S. at 343) (alteration in *Davis*). The relevant question is whether it is reasonable for police to believe a defendant "could have accessed [an item] at the time of the search." *Id.* at 198 (quoting *Gant*, 556 U.S. at 344).

## 2.

Appellant contends the district court erred in holding the cellphone was lawfully seized incident to his arrest. The district court determined that the cellphone was within Appellant's immediate control. Appellant contends that this was clearly erroneous because he was secured and could not have reached the cellphone.

21

The following facts are undisputed:

- Appellant answered the door without clothes on;

- Appellant was standing when arrested and remained standing;

- Appellant's hands were cuffed behind his back;

- At some point, Appellant was moved into the room and positioned beside the bed;

- The cellphone was on a table on the opposite side of the queen sized bed from Appellant;

- The table was "two to three feet from the edge of the bed," J.A. 105;

- Several United States marshals were present in the room with Appellant;

- One of the officers present during the arrest, Agent Abadir, testified, "[Appellant] could not have reached for the phones because he was under arrest." J.A. 98. But she testified that if Appellant "hadn't been under arrest," then "yes, absolutely" he could have reached the phones. *Id.* In other words, Agent Abadir said, "he couldn't reach because he was in handcuffs." *Id.*

- The mother of Appellant's child, Brandi Callen, who was also present in the hotel room, testified that Appellant was immediately handcuffed when the officers entered, and that without "superhero arms" Appellant could not have reached either cellphone in the room. J.A. 114.

22

The Government created this visual aid[8] to show where Appellant was located with respect to the table:



3.

We hold that the district court clearly erred in ruling that the cellphone was properly seized incident to arrest. Appellant was secured, and the cellphone was not within his reach. *See Davis*, 997 F.3d at 198 ("[W]e consider whether [the arrestee] was 'unsecured and within reaching distance' . . . at the time of the search.") (quoting *Gant*, 556 U.S. at 343).

---

[8] The X marks the spot where Appellant was standing with his hands cuffed behind his back. "NS" indicates the nightstands. And the table is where the cellphone was located.

Appellant objects to this visual aid because it does not take into account that Appellant was apprehended by the door of the hotel room and then, afterward, moved to the position depicted in the visual so that he could get dressed. We take Appellant's point, but because his motion to suppress was denied, we must view the facts in the light most favorable to the Government.

23

Appellant was standing with his hands cuffed behind his back on the opposite side of the bed from the table where the phone was lying. There were several United States marshals in the room with Appellant. He was evidently naked when arrested, but the officers were sufficiently sure of their control over Appellant that they moved him over to the bed and helped him put on clothes. In these circumstances, we have no problem holding that Appellant was secured. The Government conceded as much at oral argument: "Q: He was secured? A: Correct." Oral Argument at 18:50, *United States v. Horsley*, No. 22-4671 (4th Cir. May 10, 2024), https://www.ca4.uscourts.gov/oral-argument/listen-to-oral-arguments.

However, the parties adamantly dispute whether Appellant was within reaching distance of the cellphone, that is, whether it was within his "immediate control," *Chimel*, 395 U.S. at 763. We hold it was not, and the district court clearly erred in determining otherwise.

Indeed, Agent Abadir acknowledged that Appellant "could not have reached for the phones because he was under arrest." J.A. 98. Agent Abadir's concession is on point because (1) Appellant's hands were cuffed behind his back; (2) Appellant was separated from the cellphone by the width of a queen sized bed (60 x 80 inches),[9] whatever space was between himself and the bed, and the several feet between the bed and the table; (3) Callen was sitting on the bed between Appellant and the cellphone; and (4) there were multiple United States marshals in the hotel room. Thus, even if the Government is correct

---

[9] This is the standard size of a queen sized bed.

that Appellant could ordinarily have reached the phone with "no more than a few steps to go around the bed, or a linear high-step or jump to get on top of (and quickly across) it," Response Br. at 39, Appellant would still have needed to hurdle Callen and break past multiple able law enforcement officers before he even had a chance to twist around and seize the phone with cuffed hands. All of this compels our conclusion that Appellant was "not within reaching distance" of the cellphone. *Davis*, 997 F.3d at 198. Beyond this, even if Appellant reasonably could have reached the cell phone -- which he could not have -- it is unreasonable to believe that he could have had the time and opportunity to delete evidence from the cell phone, which is what the purported concern would be for a search incident to arrest.

To be sure, Agent Abadir also testified, in response to prompting by the district court, that, if Appellant was not handcuffed, he could have reached the cellphones -- plural. That Agent Abadir testified Appellant could have reached the cellphones in the plural is important. This is because the cellphone which is not currently at issue was apparently closer to Appellant than the cellphone at issue. The closer cellphone was evidently on the nightstand, possibly on the side of the bed where Appellant stood. Therefore, Agent Abadir's reference to the cellphones in the plural means that she might have been referring to Appellant's capacity to reach either one of them -- including the closer one. Moreover, Agent Abadir's testimony in this regard is of no moment because it is at odds with the fact that Appellant *was* handcuffed.

25

Thus, given the facts adduced by the parties concerning the scene of Appellant's arrest, Appellant was secured and not within reaching distance of the relevant cellphone. The district court clearly erred in holding otherwise.

4.

This holding is in accord with our precedent. In *United States v. Davis*, we held that an arrestee was secured and not within reaching distance of a backpack which was searched at the time of arrest. *See generally* 997 F.3d 191. There, the arrestee ("Davis") fled his vehicle with a backpack and ended up in a swamp where he was bogged down in knee-high water. *Id.* at 198. The officer pursuing Davis, weapon drawn, ordered him to exit the swamp, and Davis complied. *Id.* Davis then dropped his backpack, and the officer handcuffed him face down on the ground with his hands behind his back. *Id.* Two other officers then arrived, and the first officer searched Davis's backpack. *Id.*

We held this was not a lawful search incident to arrest:

> Under these conditions, [the officer's] warrantless search of Davis's backpack was unlawful. To be sure, there is a level of precarity when police officers arrest a suspect who has fled arrest. But there is no doubt that Davis was secured and not within reaching distance of his backpack when [the officer] unzipped and searched it. Davis was face down on the ground and handcuffed with his hands behind his back. He had just been ordered out of the swamp at gunpoint. The only other individuals within eyesight were officers, who outnumbered him three to one. And while this all took place in a residential area, it appears there was no one else around to distract the officers. Without the fluid situation created by nearby observers, the officers were able to focus solely on Davis. We have no difficulty in concluding that Davis was secured.
>
> As to whether the bag was within Davis's reaching distance, we acknowledge that he dropped the bag next to him before

26

> lying down. By the time of the search, however, Davis was handcuffed—severely curtailing the distance he could reach. We need not recount the various acrobatic maneuvers Davis would have needed to perform to place the backpack within his reaching distance at the time of the search. It is enough to say that, at the moment in question, the handcuffed and face-down Davis had severely restrained mobility and was not within reaching distance of the backpack next to him.

*Id.* at 198.

The similarities between the instant case and *Davis* are many: Appellant was handcuffed behind his back, as Davis was; Appellant was surrounded by officers, as Davis was; Appellant would have needed to contort himself to reach the seized object, as Davis would have. Like the *Davis* court, we "need not recount the various acrobatic maneuvers" Appellant would have needed to reach the cellphone, because the Government has already described them. Response Br. at 39 (hypothesizing "no more than a few steps to go around the bed, or a linear high-step or jump").

In some ways, it was even more difficult for Appellant to reach his cellphone than for Davis to reach his backpack. After all, Davis dropped his backpack right next to himself, whereas the cellphone was across the room from Appellant, on the other side of a queen sized bed, the person sitting on it, and several United States marshals.

The Government asserts that this case is more like *United States v. Ferebee*, 957 F.3d 406 (4th Cir. 2020), in which we held that a backpack was properly searched incident to arrest. In *Ferebee*, an arrestee ("Ferebee") was arrested in a third party's house. *Id.* at 410. At the time police apprehended him, Ferebee was sitting next to a backpack. *Id.*

27

Police took Ferebee outside. *Id.* at 410–11. The backpack remained inside, and police searched it. *Id.* at 411.

Although Ferebee claimed the backpack was not his, he nonetheless objected to the search of the backpack. We held Ferebee could not object to the search of the backpack because he disavowed ownership of it. *Ferebee*, 957 F.3d at 412–13. But then, we went further and held that the backpack was properly searched incident to arrest because "Ferebee was only a few steps away from the backpack. He was handcuffed, but he still could walk around somewhat freely and could easily have made a break for the backpack inside the house." *Id.* at 419.[10]

This second holding in *Ferebee* was dicta. *See Davis*, 997 F.3d at 199 n.7 ("*Ferebee*'s discussion of this point appears to have been dicta."); *Ferebee*, 957 F.3d at 423 (Floyd, J., dissenting) ("Despite holding that Ferebee abandoned his bag, the majority, in extensive dicta, goes on to conclude that even if Ferebee had not abandoned his bag, the search would not have required a warrant because it was incident to Ferebee's arrest."). A dictum is a "statement in a judicial opinion that could have been deleted without seriously impairing the analytical foundations of the holding . . . ." *Pittson Co. v. United States*, 199 F.3d 694, 703 (4th Cir. 1999). "If necessary to the outcome, a precedent's reasoning must be followed; otherwise, we are not so bound." *Payne v. Taslimi*, 998 F.3d 648, 654–55

---

[10] In *Davis*, we distinguished Davis's case on the facts from Ferebee's by noting that Ferebee was standing up, whereas Davis was lying face down. *Davis*, 997 F.3d at 199 ("Davis was face-down on the ground with his hands behind his back, not milling about like the defendant in *Ferebee*.") (internal citation omitted).

(4th Cir. 2021). We resolved *Ferebee* on the basis that Ferebee disavowed ownership of the backpack, and thus had no right to object to the search of it. *Ferebee*, 957 F.3d at 412–13. We did not need to reach the issue as to whether the search was lawful incident to arrest. Thus, the discussion of that issue was dicta.

This holding was not only dicta, it was also at odds with its own search incident to arrest rule. While we acknowledged in *Ferebee* that "a search incident to arrest is proper only if the defendant is 'unsecured and within reaching distance' of the property being searched," *Ferebee*, 957 F.3d at 419, we nevertheless held that a backpack not within reaching distance of Ferebee, who was handcuffed, was properly searched. *But cf. id.* at 425 (Floyd, J., dissenting) ("At the time of the search, Ferebee was handcuffed and indisputably not within reaching distance of his bag."). This holding conflicted with *Chimel* and with *Gant*. The question posed by *Gant* is whether a defendant has been secured and whether the thing searched is within reaching distance. *Gant*, 556 U.S. at 339 ("If there is no possibility that an arrestee could reach into the area that law enforcement officers seek to search, both justifications for the search-incident-to-arrest exception are absent and the rule does not apply."); *see also Chimel*, 395 U.S. at 763 (holding police may only search the space within an arrestee's "immediate control," meaning "the area from within which he may gain possession of a weapon or destructible evidence").

In any case, *Ferebee* is distinguishable because the officers there were searching a backpack, not a cellphone. A backpack is categorically different from a cellphone because a backpack is an opaque container, which may conceal a weapon or contraband. Because the need to secure weapons and contraband are core justifications for search incident to

29

arrest, searching a backpack like the one in *Ferebee* is more reasonable, all else equal, than a search of a cellphone, which is on its face neither a weapon nor contraband.

Thus, we find this case much closer to *Davis* than to *Ferebee*. The need to perform acrobatics to reach some object manifestly puts that object out of reach. *Davis*, 997 F.3d at 198; *see also Ferebee*, 957 F.3d at 425 (Floyd, J., dissenting) ("Yet the best the government can do is speculate . . . that Ferebee, still handcuffed, *could* have rushed back into the house, dodged past the couch and the various officers crowding the room, and, in a remarkable feat of dexterity, reached into his backpack to destroy evidence or retrieve his firearm.") (emphasis in original). As noted, the Government concedes that Appellant would have needed to perform such acrobatics: "It would have been no more than a few steps to go around the bed, or a linear high-step or jump to get on top of (and quickly across) it." Response Br. at 39. This concession puts Appellant far from the "reaching distance" described by *Gant*. 556 U.S. at 343.

Thus, we hold the district court clearly erred in determining the cellphone was within Appellant's immediate control such that it was properly seized incident to Appellant's arrest.

## B.

### The Jaguar

The second issue concerns a Jaguar that was searched after Appellant's arrest. Appellant moved to suppress evidence collected from the Jaguar, including cellphones, money, and jewelry, arguing that officers lacked either a warrant or probable cause to search the car. The Government argues that the officers had probable cause to believe the

Jaguar was a proceed of Appellant's drug trafficking. Thus, the Government argues it was subject to forfeiture, and also that the items discovered within the Jaguar were searched and seized during a lawful inventory search of the vehicle. The district court accepted the Government's argument, holding that there was probable cause for law enforcement to believe the Jaguar was a proceed of drug trafficking. As to the items officers discovered within the vehicle, the district court held these were properly searched and seized as part of an inventory search.

"[T]he police may seize an automobile without first obtaining a warrant when they have probable cause to believe that it is forfeitable contraband." *United States v. Brookins*, 345 F.3d 231, 235 (4th Cir. 2003) (citing *Florida v. White*, 526 U.S. 559, 561 (1999)). Such contraband includes "any property constituting, or derived from, any proceeds . . . directly or indirectly" obtained from the distribution of narcotics. 21 U.S.C. § 853(a)(1); *see also* 21 U.S.C. § 881(a)(6) (providing for forfeiture of "all proceeds traceable to such an exchange"); *id.* § 881(a)(3)–(4).

And "[a]n inventory search of an automobile is lawful (1) where the circumstances reasonably justified seizure or impoundment, and (2) law enforcement conducts the inventory search according to routine and standard procedures designed to secure the vehicle or its contents." *United States v. Bullette*, 854 F.3d 261, 265 (4th Cir. 2017). An inventory search is "conducted to protect the arrestee from theft of his possessions, to protect the police from false accusations of theft, and to remove dangerous items from the arrestee prior to his jailing." *United States v. Banks*, 482 F.3d 733, 739 (4th Cir. 2007).

31

1.

Probable Cause to Search the Jaguar

The district court held there was probable cause to search the Jaguar because it was a proceed of Appellant's drug trafficking. In reaching this holding, the court relied on the testimony of Officer Bailey. Officer Bailey testified that the following pieces of information provided probable cause to believe the Jaguar was a proceed of drug trafficking:

> 1. During a controlled drug purchase conducted by a police informant, Appellant told the informant he owned several vehicles, including a Jaguar;
>
> 2. Officers surveilling Appellant saw him driving the Jaguar "quite a few times," including to the Misty Mountain Road house where Appellant drove and parked the car and stored contraband;
>
> 3. Appellant was making enough money to buy a Jaguar because he was buying kilogram quantities of drugs and then reselling them by the ounce. Specifically, Officer Bailey testified that Appellant was a multi-kilogram cocaine dealer and that a single kilogram could yield $60,000–$70,000;
>
> 4. During the year to year and a half that officers were surveilling Appellant, they had never observed him go to a regular job, and Appellant had no reported employment with the Virginia Employment Commission; and
>
> 5. Social media posts revealed that Appellant had traveled to Dubai, Miami, Las Vegas, and Hawaii, indicating significant income with no apparent lawful source.

However, the district court also noted that not all the evidence suggested that the Jaguar was a proceed of drug trafficking. For example, the Jaguar was registered in the

32

name of Appellant's sister. And Officer Bailey could not confirm the date of sale of the Jaguar, how much it was purchased for, or what funds were used to purchase it.

But the district court ultimately concluded that case law supported probable cause because "evidence of drug trafficking combined with lack of legitimate sources of income will support a finding of probable cause that unexplained wealth . . . [is] the proceeds of drug trafficking." J.A. 133 (citing *United States v. Thomas*, 913 F.2d 1111, 1114 (4th Cir. 1990)); *United States v. $95,945.18*, 913 F.2d 1106, 1111 (4th Cir. 1990); *United States v. $174,206.00*, 320 F.3d 658, 662 (6th Cir. 2003)). The district court discounted the evidence that Appellant's sister owned the Jaguar in part because Officer Bailey testified that it is a common practice for drug distributors to put a vehicle in someone else's name in order to avoid forfeiture.

On appeal, Appellant contends the district court erred because it did not give sufficient weight to the Government's failure to investigate Appellant's sister's connection to the Jaguar. More specifically, the Government did not investigate whether the sister had a job, had sufficient income to buy the car, or had used any money she received from Appellant to buy the car. The Government reiterates the evidence relied upon by the district court -- Appellant's lavish lifestyle despite his unemployment, his statement that he owned a Jaguar, and his being seen driving a Jaguar. And the Government adds that, at trial, there was evidence of (1) a repair invoice introduced for repair of the Jaguar, listing Appellant as the customer; (2) testimony from another witness, Smiley, that Appellant drove a Jaguar to a cocaine deal; and (3) testimony from Smiley that Appellant showed him methamphetamine and heroin inside a Jaguar. Adgerson also testified at trial that he,

33

Appellant, and Smiley referred to their conspiracy as the "catman" cartel, a reference to the type of car Appellant drove. J.A. 533. The Government also notes that the grand jury returned an indictment for forfeiture of the Jaguar, which the Government argues supports probable cause. *See Kaley v. United States*, 571 U.S. 320, 322 (2014).

We agree with the district court that the officers had probable cause to believe that the Jaguar was a proceed of drug trafficking. The officers observed that Appellant drove a Jaguar, Appellant told one of the confidential informants that he owned a Jaguar, and Smiley testified that Appellant drove the Jaguar to a drug deal. Further, Appellant apparently did not have a regular job despite lavish spending, a fact indicating that the Jaguar was probably purchased with funds obtained from drug transactions. *Thomas*, 913 F.2d at 1114 ("[W]here a defendant's verifiable income cannot possibly account for the level of wealth displayed and where there is strong evidence that the defendant is a drug trafficker, then there is probable cause to believe that the wealth is either a direct product of the illicit activity or that it is traceable to the activity as proceeds."). Indeed, the grand jury found as much.

Our task is to "'make a practical, common-sense decision whether, given all the circumstances . . . there is a fair probability' that the properties to be forfeited are proceeds of illegal drug transactions." *Thomas*, 913 F.2d at 1114 (quoting *Illinois v. Gates*, 462 U.S. at 238). Under the circumstances of this case, there was a fair probability that the Jaguar was a proceed of illegal drug transactions.

The mere fact that the car was registered in Appellant's sister's name does not undermine this conclusion. *See United States v. Orozco*, 41 F.4th 403, 408 (4th Cir. 2022)

34

("That [a defendant] might propose an innocent explanation . . . does not defeat probable cause."). Appellant could easily have paid for the car and put it in his sister's name. The Government's failure to investigate Appellant's sister is beside the point. As the Government rightly points out, what matters is "evidence that *is* in the record[, not] what other evidence there *could be*." *United States v. Seigler*, 990 F.3d 331, 338 (4th Cir. 2021) (emphasis in original).

Thus, we conclude that there was probable cause at the time of Appellant's arrest to believe that the Jaguar was a proceed of drug trafficking.

2.

Closed Containers in the Jaguar

Appellant argues for the first time on appeal[11] that, even if officers had probable cause to seize and search the Jaguar, they lacked probable cause to search closed containers within it. This issue arises because several items officers obtained from the Jaguar were found in closed containers. The cash seized from the Jaguar was in "a blue plastic bag" in the trunk, and the high end jewelry seized from the Jaguar was in "a box" in the trunk. J.A. 100.

Appellant points out that the Government had no probable cause to believe that the containers held contraband. This argument ignores the fact that this search was of a proceed of drug trafficking. And as the Government points out, the same rationales

---

[11] In ruling on Appellant's motion to suppress, the district court noted that Appellant "did not specifically contest th[e] argument" that the Government "executed a lawful inventory search of the vehicle." J.A. 129.

35

supporting inventory searches also empower police to search closed containers within a vehicle: "to protect an owner's property while it is in the custody of the police, to insure against claims of lost, stolen, or vandalized property, and to guard the police from danger." *Colorado v. Bertine*, 479 U.S. 367, 372 (1987).

We agree with the Government that searching the containers within the Jaguar was justified by the need to inventory its contents. "A proper inventory search is merely 'an incidental administrative step following arrest and preceding incarceration.'" *Banks*, 482 F.3d at 739 (quoting *Illinois v. Lafayette*, 462 U.S. 640, 644 (1983)). Such a search is "conducted to protect the arrestee from theft of his possessions, to protect the police from false accusations of theft, and to remove dangerous items from the arrestee prior to his jailing." *Id.*

We have previously approved the search of a vehicle seized for forfeiture. *See, e.g.*, *United States v. $29,000 – U.S. Currency*, 745 F.2d 853, 856 (4th Cir. 1984); *see also United States v. Decker*, 19 F.3d 287, 290 (6th Cir. 1994) ("[W]e have no hesitancy in joining those circuits that hold that a pre-forfeiture inventory search of a vehicle does not require a warrant."); *United States v. Pace*, 898 F.2d 1218, 1245 (7th Cir. 1990) ("The cases generally hold that where police have probable cause to believe a car is subject to forfeiture, or have validly seized a car for forfeiture, the police may search the car without a warrant."). Officers may conduct an inventory search of an automobile if circumstances reasonably justify seizure, and law enforcement conducts the inventory search according to routine and standard procedures designed to secure the vehicle or its contents. *Bullette*, 854 F.3d at 265; *see also United States v. Bizzell*, 19 F.3d 1524, 1526 (4th Cir. 1994).

36

"Such inventory searches, however, must 'be conducted according to standardized criteria.'" *Banks*, 482 F.3d at 739 (quoting *Bertine*, 479 U.S. at 374 n.6).

Agent Abadir, who conducted the search at the hotel where Appellant was arrested, testified during the suppression hearing that she searched the vehicle "under DEA policy and procedures . . . to account for personal property." J.A. 99. She also agreed that she searched the vehicle to "check [it] for contraband or anything that could be dangerous," which was "part of DEA policy." *Id.* at 101. And while Appellant now argues that Agent Abadir "did not testify that the policy allowed searching closed containers," Reply Br. at 39, the lack of specificity is not decisive. The district court was entitled to credit Agent Abadir's oral testimony on DEA policy. *See Bullete*, 854 F.3d at 265 (affirming search of a glove compartment when agent offered oral "testimony concerning DEA standard practice" indicating "law enforcement would have . . . inventoried all of [the car's] contents"); *United States v. Matthews*, 591 F.3d 230, 237–38 (4th Cir. 2009) ("Only by performing a full inventory of the car—which includes opening closed containers—could an officer identify all the vehicle's valuables and effectively secure them."). The lack of specificity may also be attributable to the fact that, below, "Horsley [did] not seriously challenge[] in briefing or argument . . . that law enforcement conducted a proper inventory search in this case." J.A. 138.

In any case, we note that the only items discovered within the containers, the cash and the jewelry, were not critical to the Government's case. The Government separately seized kilograms of drugs, and additional wads of cash, from stash houses linked to

37

Appellant. Any error associated with the search of containers within the Jaguar was, therefore, harmless.

Thus, we affirm the district court's denial of Appellant's motion to suppress the items obtained from the search and inventory of the Jaguar.

## C.

### Harmless Error

The Government argues that we need not reach the Fourth Amendment issues concerning the cellphone and the Jaguar because the overall strength of the Government's case renders any error harmless. The Government notes that the following evidence was introduced at trial which is not at issue:

1. Evidence from the seven controlled buys;

2. Adgerson's testimony about he and Appellant's extensive drug operation, including involving methamphetamine, heroin, cocaine, and cocaine base;

3. Text messages from Appellant's cellphone seized from his Misty Mountain home that corroborated Adgerson's testimony;

4. Smiley's testimony about Appellant offering him methamphetamine and heroin, in addition to their cocaine dealings;

5. Three kilograms of methamphetamine, nearly two kilograms of cocaine, and almost a kilogram of heroin from the Blackburn Street stash house (which came from a drug deal Appellant arranged) along with other drug paraphernalia;

6. The drug ledger and the money counter found in Appellant's home;

38

7.  The cocaine and large amounts of cash seized from Adgerson's Euclid Avenue home; and

8.  Expert testimony from Detective Knabb about drug operations and terminology, which mapped onto other evidence.

The Government also points out that Appellant began and ended the trial by admitting that he dealt cocaine. J.A. 310 ("[O]ur evidence and our case will not be to you that Mr. Horsley didn't have some involvement with the sale of cocaine. You're going to hear about that."); *id.* ("[Y]ou're going to be called upon to decide what role he played in his sales of cocaine."); *id.* at 782 (arguing "you might conclude . . . that there were certain distributions made of cocaine . . . [but not of] a conspiracy to distribute methamphetamine or heroin"); *id.* at 792 ("We submit to you that with respect to the distributions of cocaine, that the cocaine was distributed from [Appellant] to Mr. Adgerson."). All that was left for the jury to decide was whether Appellant also conspired to distribute methamphetamine, heroin, and cocaine base. The Government further notes that texts admitted into evidence from the cellphone discovered at Appellant's Misty Mountain address duplicate the general thrust of evidence gathered from the cellphone at issue in the suppression litigation.

Here again, we agree with the Government. The uncontested evidence was sufficient to convict Appellant. The controlled buys gave the jury a substantial basis to conclude that Appellant was guilty of the distribution charges. And the physical evidence seized from the three stash houses, including Appellant's house, which were ultimately linked to Appellant via witness testimony, plus Adgerson and Smiley's direct testimony, gave the jury a substantial basis to find Appellant guilty of the conspiracy charges. The

39

gross weights of narcotics seized during the controlled buys and the house raids --

approximately 3,197 grams of methamphetamine, 2,570 grams of cocaine, and 997 grams

of heroin -- were more than sufficient for the jury to hold against Appellant in the same

drug weights which it attributed to him on the verdict form: 500 grams or more of

methamphetamine, 500 grams or more of cocaine, and 100 grams or more of heroin.  Thus,

the jury could easily have convicted Appellant without relying on the cellphone seized

during the hotel room arrest or the cash and jewelry seized from the Jaguar, which we have

held were properly seized regardless.

## D.

### Interpretation of Texts

Appellant argues that the district court erred when it allowed one of the agents who

testified at trial, Officer Bailey, to opine as to the meaning of certain texts between

Appellant and his associates.  Officer Bailey was not admitted as an expert, and thus,

Appellant argues that Officer Bailey's testimony about what the texts meant was improper.

Appellant notes that, during Officer Bailey's trial testimony, he read a number of

texts between Appellant and his associates and interpreted the texts as being about drug

transactions:

> Q. So how do you interpret those messages together?
>
> A. It appears they were trying to discuss making a press. And
> 600 grams, they want a box big enough to be able to compress
> 600 grams into it.

40

J.A. 691.[12]

Q. All right. And if we go down, look at 98.

A. I feel you. When we get this "S" correct, I never knew of a blank with an official joint. Heard about them joints up north. Them blanks was going for a grib. That's why only the pins got the official joints. We go focus on the bottom—blank—low ticket band or two, maybe more.

Q. And then what's the response for that?

A. For the press?

Q. So what do you take those two messages together to mean in the context of this?

A. My interpretation of it there is he—the two individuals involved in the conversation weren't familiar with anybody around here that ever had a kilogram press.

J.A. 693.

Q. All right. And what's the direction of this first message 87?

A. It's an incoming message, Yo, bruh, the broke down "S" don't come back.

Q. Okay. The next message?

A. It turned black.

Q. And if we could keep reading, 89?

A. Blank—you don't know what you doing.

Q. And then 90?

A. What you trying to do?

---

[12] According to Officer Knabb, the Government's expert on drug trafficking, a "press" is a device used to compress loose quantities of a substance into a brick for transportation or sale.  J.A. 662.

Q. Okay. And go to 91.

A. He responds, I was going to turn it into half and half.

Q. And 92?

A. You don't know what you're doing. That's fire, bro.

Q. So what do those series of messages together mean?

A. To me it sounds like the sender of the text messages was trying to cook crack cocaine and failed at it, and was trying to complain about the quality of the original powder cocaine.

J.A. 697–98.

Q. Okay. What's the context of that message, that response there?

A. Just talking about he had—apparently the user of this phone had provided narcotics to the sender of these messages, and apparently money was made. He's asking where is the money from the sales of those narcotics, and apparently there was a discrepancy on how much was given to the person by Marcus. And he was saying so where is the other work, which is another street slang for narcotic.

J.A. 703.

Federal Rule of Evidence 701 permits lay opinion testimony which is "(a) rationally based on the witness's perception, (b) helpful to clearly understanding the witness's testimony or to determining a fact in issue; and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702." Fed. R. Evid. 701. We have previously emphasized the line between lay opinion testimony and expert testimony. "We [have] held 'lay opinion testimony *must* be based on personal knowledge.'" *United States v. Johnson*, 617 F.3d 286, 292 (4th Cir. 2010) (quoting *United States v. Perkins*, 470 F.3d

42

150, 155–56 (4th Cir. 2006)) (emphasis in *Johnson*). And to build a foundation for lay testimony, "it must be 'based on the perception of the witness.'" *Id.* at 293–94 (quoting *TLT-Babcock Inc. v. Emerson Elec. Co.*, 33 F.3d 397, 400 (4th Cir. 1994)).

"At bottom . . . Rule 701 forbids the admission of expert testimony dressed in lay witness clothing." *Perkins*, 470 F.3d at 156. "Therefore, if the Government seeks to introduce a law enforcement agent's testimony about statements made during recorded telephone calls and the agent was neither a party to the conversation nor contemporaneously listening to the conversation, the law enforcement agent should generally be proffered as an expert witness." *United States v. Walker*, 32 F.4th 377, 392 (4th Cir. 2022).

Appellant argues Officer Bailey's interpretations of the texts were inappropriate because the texts were comprehensible to laypeople without an officer's gloss, and Officer Bailey was not admitted as an expert. The Government argues that Appellant's substantial rights were unaffected by Officer Bailey's testimony, because although Officer Bailey testified about the meaning of certain terms in the text messages, Officer Knabb had just been admitted as an expert and had explained the meaning of terms used in the drug trade, including those Officer Bailey discussed in his testimony. Thus, the terms whose meanings Officer Bailey paraphrased to the jury had already been defined by a qualified expert. The Government also argues that Appellant did not object at trial to the introduction of the testimony he now argues was inadmissible, such that plain error review applies. The Government further argues that the overwhelming evidence against Appellant renders any error concerning Officer Bailey's testimony harmless.

43

We first address whether this issue was preserved through an objection and then discuss the merits of Appellant's argument.

1.

Whether an Objection Was Made

The Government argues that Appellant did not object to any of Officer Bailey's testimony which he now questions. As to three of the portions of Officer Bailey's testimony -- those found at J.A. 691, 693, 703 (pages 40–42 *supra*) -- the Government asserts there was no objection at all. As to the fourth portion, found at J.A. 697–98 (pages 41–42, *supra*), the Government argues there was an objection, but not to the part of the testimony which Appellant now argues was inadmissible.

The Government is correct. The record indicates that Appellant made no objection to three of the portions of testimony he now argues were improper. As to the fourth portion, Appellant raised an objection, but he did not object to Officer Bailey's interpretation of the substance of the texts. Rather, he objected because Officer Bailey described one of the speakers in a text thread as Appellant. *See* J.A. 698 ("I'm going to object to the use of [Appellant's name]."). Thus, Appellant failed to object to the specific error he now argues was committed.

Therefore, plain error review applies, and Appellant must "establish that: (1) an error occurred; (2) the error was plain; and (3) the error affected his substantial rights." *Banks*, 29 F.4th at 174 (citation omitted). And "we will only exercise our discretion to correct the error if it satisfies a fourth prong, that it 'seriously affects the fairness, integrity

44

or public reputation of judicial proceedings.'" *Id.* (quoting *United States v. Olano*, 507 U.S. 725, 732 (1993)).

2.

Whether It Was Error to Admit the Testimony

Appellant argues that the court should not have allowed Officer Bailey to offer his opinion regarding the meaning of the texts because he was not admitted as an expert and was not a party to the texts, nor did he contemporaneously listen to the conversation.

We addressed a highly similar fact pattern in *Johnson*, 617 F.3d 286. There, the Government called a witness, "Agent Smith[,] to testify regarding his interpretation of the wiretapped phone calls between [a witness] and [the defendant]." *Id.* at 293. The defendant objected. *Id.* In response to that objection, the Government elicited testimony from Agent Smith regarding his "credentials and training, [but] *not his observations* from the surveillance employed in this case." *Id.* (emphasis in original). "Agent Smith admitted that he did not participate in the surveillance during the investigation, but rather gleaned information from interviews with suspects and charged members of the conspiracy *after* listening to the phone calls." *Id.* Thus, "[h]is post-hoc assessments [could not] be credited as a substitute for the personal knowledge and perception required under Rule 701." *Id.*

In *Johnson*, we contrasted this sort of post hoc discussion of evidence that had been gathered in a case and first-hand knowledge, "directly observing the surveillance or even listening to all of the relevant calls in question." *Johnson*, 617 F.3d at 293. The difference was between "second-hand information" and "foundational personal perception needed under Rule 701." *Id.*; *see also United States v. White*, No. 21-4197, 2023 WL 3597546, at

45

*3 (4th Cir. 2023) (per curiam) ("[W]e have repeatedly held that the personal knowledge requirement is not satisfied by post-hoc assessments about a conversation one had not participated in.") (citations omitted); *Walker*, 32 F.4th at 391–92 (holding officer's testimony "should not have been admitted as lay opinion testimony" when "the interpretations he offered at trial were not based on his contemporaneous understanding of the language used but instead the result of his putting the pieces together based on what he discovered during his investigation"); *cf. United States v. Hassan*, 742 F.3d 104, 136 (4th Cir. 2014) ("[W]e have ruled that testimony regarding a witness's understanding of what the defendant meant by certain statements is permissible lay testimony, so long as the witness's understanding is predicated on his knowledge and participation in the conversation.").

Here, Officer Bailey's testimony was just like other agents' testimony we have held as inadmissible.  Officer Bailey was not admitted as an expert and was not a direct party to the conversations.  His testimony was a "narrative gloss."  *Johnson*, 617 F.3d at 293 (quoting *United States v. Peoples*, 250 F.3d 630, 640–41 (8th Cir. 2001)); *see also Perkins*, 470 F.3d at 156 ("At bottom . . . Rule 701 forbids the admission of expert testimony dressed in lay witness clothing.").

Therefore, it was error for the district court to admit this testimony, and plainly so. Nevertheless, in this case, the error was harmless and the testimony did not seriously affect fairness, integrity, or public reputation of the proceedings.  The prejudice to Appellant was slight because the Government could have introduced the texts another way, such as through Officer Knabb, their drug slang expert.  Indeed, given Officer Knabb's testimony,

46

the jury was itself equipped to understand the texts absent the testimony of Officer Bailey. And ultimately, the Government's strongest evidence was not the texts that Officer Bailey interpreted, but, rather, the direct overwhelming physical evidence seized from the stash houses and the testimony of Appellant's associates in the drug trafficking conspiracy. Even Appellant concedes that the purpose of Officer Bailey's testimony was to "corroborate" the Government's testifying witnesses. Opening Br. at 14.

E.

Jury Verdict Form

Appellant's final point of error raised on appeal concerns the jury's verdict form. When the jury first returned from deliberations, it handed up a verdict form that apparently contained a clerical error.

Appellant argues that the jury's finding regarding cocaine base, when it completed the verdict form a second time, was not the correction of a clerical oversight, but a re-assessment of that issue. In other words, according to Appellant, the jury improperly changed its mind after it rendered a final verdict. The Government responds that the jury was simply correcting its failure to fill out the entire question and merely checked "Cocaine base" as part of that process. The Government further argues that, in any event, the jury was entitled to revisit its verdict prior to discharge. Finally, the Government asserts that the jury's finding of guilt on the other drugs renders any defect regarding cocaine base irrelevant.

Here, the jury's verdict was not yet final when it first handed up the verdict form. We have held that a "a verdict is not final until it has been recorded, after the parties have

47

had adequate time to request a poll." *United States v. Cherry*, 720 F.3d 161, 167 (4th Cir. 2013) (citing *Gov't of the Virgin Islands v. Hercules*, 875 F.2d 414, 419 (3d Cir. 1989) ("[A] verdict is not final when announced. . . . Rather, the test for validity of the verdict is whether it was certain, unqualified and unambiguous considering the circumstances of the receipt of the verdict and poll of the jurors relative to their verdict.") (cleaned up)).

The district court reviewed the form when the jury first executed it, identified a clerical error, and thus directed the jury to return to the jury room to correct that error. When the jury returned, they confirmed that their failure to check the relevant boxes on the first execution of the form was a clerical oversight, and then a poll was taken. Therefore, the district court properly entered the corrected version of the verdict form as the final judgment.

In any case, the jury's finding regarding cocaine base had no effect on guilt or punishment. In their first completion of the verdict form, the jury found Appellant guilty of conspiracy and possession with intent to distribute cocaine, methamphetamine, and heroin. They also found Appellant conspired to distribute cocaine and methamphetamine at the maximum drug weights provided by the verdict form: 500 grams or more of methamphetamine and 500 grams or more of cocaine. Thus, regardless of the jury's finding as to cocaine base, the jury found Appellant guilty of conspiracy and possession with intent to distribute controlled substances (Count 1), and the statutory ranges of punishments for the unchallenged drug weights of cocaine and methamphetamine in Count 2 are higher than the statutory range of punishment associated with cocaine base. *Compare* 21 U.S.C. §§ 841(b)(1)(A), (B) *with id.* § 841(b)(1)(C). Any error was harmless.

48

III.

For the foregoing reasons, the judgment of conviction is

*AFFIRMED*.